ATTORNEY GENERAL *vs.* SECRETARY OF THE
COMMONWEALTH.

Suffolk.    April 5, 1940. — May 10, 1940.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & RONAN, JJ.

*Constitutional Law*, Determination of senatorial districts, General Court. *Jurisdiction*, Justiciable question. *Mandamus*. *Practice, Civil*, Parties, Striking out of pleadings. *Attorney General*.

The question, whether the division of the Commonwealth into senatorial districts by St. 1939, c. 507, § 2, amending G. L. (Ter. Ed.) c. 57, § 3, conformed to constitutional requirements, was a matter for judicial determination and was properly presented by an information by the Attorney General in the nature of a petition for a writ of mandamus commanding the Secretary of the Commonwealth to refrain from preparing ballots in conformity with the statute.

In determining whether the legislative division of the Commonwealth

into senatorial districts, effected by the amendment of G. L. (Ter. Ed.) c. 57, § 3, by St. 1939, c. 507, § 2, conformed to those provisions of art. 22 in the form adopted by art. 71 of the Amendments to the Constitution which require that each district must "contain, as nearly as may be, an equal number of legal voters" and that districts must be "formed, as nearly as may be, without uniting two counties, or parts of two or more counties, into one district," this court could not consider the expediency of the enactment or whether a better division could have been made, but, applying the rule that all rational presumptions were to be made in favor of the validity of the legislation, determined only whether variations from equality in number of legal voters among the districts and combinations of units of different counties in districts were so clearly unreasonable as not to be within the power given to the Legislature to exercise its judgment and discretion in making the division.

The division of the Commonwealth into senatorial districts effected by St. 1939, c. 507, § 2, amending G. L. (Ter. Ed.) c. 57, § 3, did not transcend the power given the Legislature by art. 22, in the form adopted by art. 71, of the Amendments to the Constitution, and was valid.

A motion to strike averments raising a nonjusticiable issue from an information by the Attorney General in the nature of a petition for a writ of mandamus was correct practice.

Whether the General Court was actuated by partisan motives in making a division of the Commonwealth into senatorial districts was a question not open in proceedings to test the constitutionality of the division.

INFORMATION, filed in the Supreme Judicial Court for the county of Suffolk on February 28, 1940.

The case was reserved by *Ronan, J.,* for determination by the full court.

*P. A. Dever,* Attorney General, *& E. O. Proctor,* Assistant Attorney General, (*E. McPartlin,* Assistant Attorney General, with them,) for the petitioner.

*C. B. Rugg,* Special Assistant Attorney General, for the respondent.

FIELD, C.J.   This is an information, in the nature of a petition for a writ of mandamus, by the Attorney General on behalf of the Commonwealth. It was filed February 28, 1940. The respondent is the Secretary of the Commonwealth, who is charged with the duty of preparing ballots to use in the election of State officers. G. L. (Ter. Ed.) c. 54, § 40. The Attorney General seeks a writ of mandamus to restrain the Secretary from preparing ballots in

conformity with the provisions of St. 1939, c. 507, approved August 12, 1939, entitled "An Act to establish councillor and senatorial districts," on the ground that this statute is unconstitutional because of violation of art. 21 and art. 22 of the Amendments to the Constitution of the Commonwealth, as substituted by art. 71 of said Amendments for the former articles so numbered.

The case was heard by a single justice of this court on the amended petition; the respondent's demurrer, motion to strike and answer; the petitioner's traverse and an agreed statement of facts. He found the facts to be as stated in the agreed statement of facts and, at the request of the parties, reserved and reported the case, without decision, upon the pleadings, the agreed statement of facts and his findings for the consideration of the full court. On a report in this form no exercise of discretion is involved. The question for determination by the full court is whether the writ ought to issue as matter of law. *Lowry* v. *Commissioner of Agriculture*, 302 Mass. 111.

St. 1939, c. 507, in its first section, purports to substitute for G. L. (Ter. Ed.) c. 57, § 2, a new section whereby the Commonwealth is divided for the purpose of choosing councillors into eight councillor districts, each of which consists of several senatorial districts. No question is raised as to the propriety of this division into councillor districts except as it may be affected by the validity of the division of the Commonwealth into senatorial districts by the same statute. St. 1939, c. 507, in its second section, purports to substitute for G. L. (Ter. Ed.) c. 57, § 3, a new section whereby the Commonwealth is divided for the purpose of choosing senators into forty senatorial districts, which are described therein. The Attorney General contends that this division into senatorial districts does not conform to the constitutional requirements.

Article 21 of the Amendments to the Constitution of the Commonwealth in its present form (see art. 71) provides, in part, that "In the year nineteen hundred and thirty-five and every tenth year thereafter a census of the inhabitants of each city and town shall be taken and a special

enumeration shall be made of the legal voters therein.  Said special enumeration shall also specify the number of legal voters residing in each precinct of each town containing twelve thousand or more inhabitants according to said census and in each ward of each city."  This article provides also for the division of counties into representative districts and the apportionment of representatives among such districts.  Article 22 of said Amendments in its present form (see art. 71) is as follows: "Each special enumeration of legal voters required in the preceding article of amendment shall likewise be the basis for determining the senatorial districts and also the councillor districts for the ten year period beginning with the first Wednesday in the fourth January following such enumeration; provided, that such districts as established in the year nineteen hundred and twenty-six shall continue in effect until the first Wednesday in January in the year nineteen hundred and thirty-nine.  The senate shall consist of forty members.  The general court shall, at its first regular session after the return of each special enumeration, divide the commonwealth into forty districts of contiguous territory, each district to contain, as nearly as may be, an equal number of legal voters, according to said special enumeration; provided, however, that no town or ward of a city shall be divided therefor; and such districts shall be formed, as nearly as may be, without uniting two counties, or parts of two or more counties, into one district.  The general court may by law limit the time within which judicial proceedings may be instituted calling in question such division.  Each district shall elect one senator, who shall have been an inhabitant of this commonwealth five years at least immediately preceding his election, and at the time of his election shall be an inhabitant of the district for which he is chosen; and he shall cease to represent such senatorial district when he shall cease to be an inhabitant of the commonwealth."

First.  The question whether the division of the Commonwealth into senatorial districts by St. 1939, c. 507, conforms to the constitutional requirements — like ques-

tions of constitutionality of other statutes — is a matter for judicial determination when the question is properly raised between litigants. See *Horton* v. *Attorney General*, 269 Mass. 503, 507; *Prescott* v. *Secretary of the Commonwealth*, 299 Mass. 191, 196. Indeed, this is recognized as true by the provision of art. 22 that the "general court may by law limit the time within which judicial proceedings may be instituted calling in question such division." (No such limitation, however, has been imposed by the General Court.) There is nothing in the nature of the statute that precludes such judicial review, though the scope of such review presents a further question. See *Parker* v. *State*, 133 Ind. 178; *Giddings* v. *Blacker*, 93 Mich. 1; *Sherrill* v. *O'Brien*, 188 N. Y. 185; *State* v. *Cunningham*, 81 Wis. 440; *State* v. *Cunningham*, 83 Wis. 90. Compare *Attorney General* v. *Suffolk County Apportionment Commissioners*, 224 Mass. 598, 601–603.

Second. It is apparent that the duties of the Secretary of the Commonwealth with relation to the preparation of ballots for use in the election of State officers are affected by St. 1939, c. 507, if it is valid. The respondent rightly makes no contention that mandamus is not a proper proceeding whereby to raise the question of the constitutionality of the statute to the end that if the statute is determined to be unconstitutional the respondent may be restrained from acting thereunder. Since the purpose of the proceeding is to control the conduct of a public officer in the performance of his official duties and no special statutory remedy is afforded, it is not fatal to the maintenance of the proceeding that the relief sought is an order commanding the respondent to refrain from acting under the statute, and not an order commanding affirmative action by him. See *Larcom* v. *Olin*, 160 Mass. 102, 110–111; *Graham* v. *Roberts*, 200 Mass. 152; *Cunningham* v. *Mayor of Cambridge*, 222 Mass. 574, 580; *Bancroft* v. *Building Commissioner of Boston*, 257 Mass. 82; *Brooks* v. *Secretary of the Commonwealth*, 257 Mass. 91; *Horton* v. *Attorney General*, 269 Mass. 503. Compare *Department of Public Utilities* v. *Trustees of New York, New Haven & Hartford*

*Railroad*, 304 Mass. 664, 672. And the respondent rightly makes no contention that the Attorney General is not a proper party to institute the proceeding. Compliance with the constitutional requirements governing the division of the Commonwealth into senatorial districts obviously is a matter of public concern. "Where the public interests are involved, the Attorney General may institute a petition for mandamus to vindicate the public right." *Attorney General* v. *Suffolk County Apportionment Commissioners*, 224 Mass. 598, 610.

Third. In considering the validity of St. 1939, c. 507, this court cannot "consider the expediency of its enactments or the wisdom of its provisions." *Howes Brothers Co.* v. *Unemployment Compensation Commission*, 296 Mass. 275, 283. The court can consider only the question whether the statute violates constitutional provisions. In considering this question the court is bound by the fundamental principles, frequently stated, expressed in *Perkins* v. *Westwood*, 226 Mass. 268, 271, in the following terms: "All rational presumptions are made in favor of the validity of every act of the legislative department of government, and the court will not refuse to enforce it unless its conflict with the Constitution is established beyond reasonable doubt. It will not be declared void unless it is impossible by any reasonable construction to interpret its provisions in harmony with the Constitution. These were early declared by this court to be fundamental principles of constitutional law, and they have been followed consistently for more than a century." See also *Wellington, petitioner*, 16 Pick. 87, 95; *Attorney General* v. *Pelletier*, 240 Mass. 264, 298–299; *Attorney General* v. *Brissenden*, 271 Mass. 172, 177. Cases analogous to the present case that have involved the validity of divisions of counties into representative districts and the apportionment of representatives among these districts have been held to be governed by the same principle, though under the applicable constitutional provision the divisions and apportionments were made by commissioners and not by the General Court. Referring to such a division and apportionment it was said in *Donovan* v.

*Suffolk County Apportionment Commissioners,* 225 Mass. 55, 58, that the report of the commissioners "is entitled to all the presumptions which ordinarily are made in favor of the constitutionality of a statute." See also *Brophy* v. *Suffolk County Apportionment Commissioners,* 225 Mass. 124, 128.

Fourth. The duty imposed upon the General Court by the Constitution, so far as it related to senatorial districts, was to divide the Commonwealth into forty such districts. The constitutional basis for such division was the "special enumeration of legal voters" made in 1935, according to which enumeration the total number of legal voters within the Commonwealth was 1,847,364. The constitutional limitations upon the division into senatorial districts are four: (a) "no town or ward of a city shall be divided." (It is to be observed that there is no prohibition against the division of a city. The indivisible unit in the case of a city is a ward thereof.) (b) Each district must consist of "contiguous territory," (c) and must "contain, as nearly as may be, an equal number of legal voters," and (d) districts must be "formed, as nearly as may be, without uniting two counties, or parts of two or more counties, into one district."

1. The first two limitations above set forth are stated in absolute terms without suggestion of possibility of variation therefrom in the slightest degree. From an examination of the maps submitted with the agreed statement of facts it appears that these requirements were complied with absolutely by St. 1939, c. 507. There is no contention to the contrary.

2. The Attorney General contends, however, that the statute under consideration fails to comply with both the other requirements and for that reason is unconstitutional. The language of these requirements, by the inclusion therein, in each instance, of the phrase "as nearly as may be," recognizes that there may be some variation among the senatorial districts from exact mathematical equality of numbers of legal voters, and that in forming such districts there may be some combinations of units — towns or wards

of cities — located in different counties without violation of the constitutional requirements.   It is apparent from the facts agreed upon that in the division made by the statute there is a variation from exact equality in the numbers of legal voters within the several senatorial districts, and that there are several senatorial districts in which units from different counties are combined.   In accordance with fundamental principles the question for our decision is whether it is established beyond reasonable doubt that such a variation and such combinations are beyond the scope of legislative power so that the legislative enactment must be struck down.   See *Attorney General* v. *Suffolk County Apportionment Commissioners*, 224 Mass. 598, 607; *McGlue* v. *County Commissioners*, 225 Mass. 59, 64; *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, 128–129.

The division of the Commonwealth into forty senatorial districts in conformity with the constitutional requirements is a matter of much complexity, particularly as the requirements that towns and wards of cities shall not be divided, and that each senatorial district shall consist of contiguous territory are absolute.   Obviously in view of the large number of towns and wards of cities within the Commonwealth various combinations of such indivisible units into districts of contiguous territory are possible.   Yet the location of the several units with relation to other units and the large numbers of legal voters in some of the units limit greatly the possibility of combinations of units conforming to the requirements of the Constitution.   (At the time of the special enumeration of legal voters in 1935 there were 316 towns and 286 wards of cities within the Commonwealth, making a total of 602 indivisible units.   The number of legal voters within a unit ranged from 13 to 22,856.)   Subject to the limitations imposed by the Constitution, however, the selection of the towns and wards to be combined in a senatorial district is a matter for the judgment and discretion of the General Court and, furthermore, the phrase "as nearly as may be," used in connection with the requirement of equality of numbers of legal voters in the several districts and also in

connection with the prohibition against uniting counties or parts thereof in one district, does not import that the General Court must make the division which is literally the nearest to such equality and to the avoidance of county combinations that any ingenious mind can devise.  See *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, 128.  See also *People* v. *Thompson*, 155 Ill. 451, 480–481; *People* v. *Carlock*, 198 Ill. 150, 160–161; *Opinions of the Justices*, 18 Maine, 458; *Carter* v. *Rice*, 135 N. Y. 473, 500–501.  Such an interpretation of the Constitution would make the statutory division merely a problem in arithmetic, the solving of which would be largely ministerial in nature, with little room for exercise by the General Court of its judgment and discretion, and would subject any division made to the risk of being declared invalid if the General Court failed to reach the conclusion which is the nearest one possible to arithmetical exactness. It is not to be assumed that the people in adopting the governing constitutional provision intended to impose upon the legislative department a duty so largely ministerial in nature.  On the contrary, it is a necessary conclusion that a statutory division, whereby the combinations of towns and wards in senatorial districts reasonably approximate equality of numbers of legal voters and the avoidance of county combinations, cannot be overthrown by this court merely because it is demonstrated, or the court is of opinion, that a somewhat better division in these respects could have been made.  And while undoubtedly such approximate equality within the several senatorial districts is an essential element of a constitutional division of the Commonwealth into such districts, the fact that both the provision requiring equality of numbers and the provision requiring avoidance of county combination districts are modified by the same phrase, "as nearly as may be," leaves some scope for the exercise by the General Court of its judgment and discretion in determining the extent to which either of these requirements shall yield to the other.  The Constitution does not direct that either of them yield to the other, but does prohibit any departure from either of them that is un-

reasonable in the light of all the limitations imposed upon legislative action.

The General Court in dividing the Commonwealth into senatorial districts can be held to no stricter standard than are commissioners upon whom is imposed the duty of dividing the several counties into representative districts and apportioning representatives among such districts. By the provisions of art. 21 of the Amendments to the Constitution prior to the amendment of this article by art. 71 of the Amendments (see also article 21 as so amended) certain commissioners were directed to divide counties into representative districts "so as to apportion the representation assigned to each county equally, as nearly as may be, according to the relative number of legal voters in the several districts of each county." With reference to a report of such commissioners this court said in *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, 128–129: "The division and apportionment of the present report are not ideal. Doubtless a closer approximation to equality might have been made. But the Constitution has placed the duty of making the division and apportionment upon the commissioners and not upon the court. There is room for some diversity of honest opinion in selecting among the various possible methods the best one for forming the districts. Sagacity is demanded in reaching a right determination. The division and apportionment is not a mere example in arithmetic. It involves the exercise of sound judgment and practical wisdom. When the report disregards a reasonable application of sound judgment, acting within the positive command for equality of voting power contained in the amendment to the Constitution, then it is a nullity. Every reasonable presumption must be made in favor of the report of the commissioners. The function of the court is not to review or revise the exercise of official judgment within its legitimate limits, but only to declare void a division and apportionment so vicious in its nature as to transcend the constitutional power of the commissioners. Something must be left to the commissioners, unless in substance the division and apportionment are to be made at last by

the court." See also *Attorney General* v. *Suffolk County Apportionment Commissioners,* 224 Mass. 589, 604–605, 606–607; *McGlue* v. *County Commissioners,* 225 Mass. 59, 63–64.

3. The Attorney General, in support of his contention that the division of the Commonwealth into senatorial districts made by St. 1939, c. 507, is unconstitutional, has submitted for the consideration of the court three slightly different plans for division of the Commonwealth into such districts as suggestions of possible alternatives to the division made by the statute. The combinations of towns and wards made in each of the suggested divisions differ materially from those made by the statutory division so that comparison is difficult. But the proposed districts in each of the suggested divisions in general vary somewhat less from equality in numbers of legal voters than do the districts created by the statute, and each of the suggested divisions makes fewer county combination districts than does the statutory division. However, for reasons previously stated, this fact, in itself, is not fatal to the statutory division. See also *Matter of Baird,* 142 N. Y. 523, 528–529; *Sherrill* v. *O'Brien,* 188 N. Y. 185, 198. It has weight only so far as it bears upon the question whether the statutory division departs from equality of numbers and creates county combination districts to an extent so unreasonable as to be "vicious in its nature." See *Brophy* v. *Suffolk County Apportionment Commissioners,* 225 Mass. 124, 128.

4. In our opinion the statutory division cannot rightly be said to be so unreasonable in its departure from equality of numbers of legal voters and in its creation of county combination districts as to be unconstitutional.

A. We consider the question first on the basis of a general analysis of the statutory division. If the legal voters within the Commonwealth, according to the special enumeration of such voters, were equally divided among forty senatorial districts the number of such voters in each district would be 46,184. The number of such voters in each of the senatorial districts according to the statutory division

is set out in a footnote.[1]   According to this division the average variation of the forty senatorial districts from this standard — either above or below it — is 3,043 legal voters, or a little over $6\frac{1}{2}\%$ of the standard.   There are seventeen districts in which the variation from the standard exceeds the average variation and seven other districts in which the variation from the standard exceeds 5% of such standard. The greatest variation from the standard in an oversize district is in the Sixth Suffolk District which exceeds the standard by 5,804 legal voters, or 12.56% of the standard, and the greatest variation from the standard in an undersize district is in the First Suffolk District which falls below the standard by 7,903 legal voters, or 17.11%.   It is recognized by the Attorney General that special difficulties arise in forming districts in the county of Suffolk by reason particularly of the large size of the wards — indivisible units — of the city of Boston.   See *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, 126.   In the nine districts including parts of the county of Suffolk the average variation from the standard is 4,428 legal voters, or 9.58% of the standard.   In the remaining thirty-one districts the average variation from the standard is 2,641 legal voters, or 5.71% of the standard.   There are twelve county combination districts, of which one includes the whole or parts of four different counties; three include the whole or parts of three different counties, and eight include parts of two different counties.

It may fairly be assumed that divisions suggested by the

---

[1]. Berkshire 48,205; 2. First Bristol 46,981; 3. Second Bristol 45,497; 4. Third Bristol 48,025; 5. Cape and Plymouth 43,238; 6. First Essex 49,047; 7. Second Essex 43,419; 8. Third Essex 47,797; 9. Fourth Essex 43,585; 10. Fifth Essex 45,694; 11. Franklin and Hampshire 47,081; 12. First Hampden 45,981; 13. Second Hampden 49,603; 14. Hampden, Hampshire, and Berkshire 49,739; 15. First Middlesex 48,034; 16. Second Middlesex 51,664; 17. Third Middlesex 45,026; 18. Fourth Middlesex 51,716; 19. Fifth Middlesex 44,265; 20. Sixth Middlesex 51,904; 21. Seventh Middlesex 42,165; 22. Middlesex and Norfolk 44,172; 23. Middlesex and Suffolk 51,453; 24. First Norfolk 43,809; 25. Second Norfolk 43,476; 26. Norfolk and Plymouth 45,915; 27. Norfolk and Suffolk 42,110; 28. Plymouth 40,493; 29. First Suffolk 38,281; 30. Second Suffolk 51,703; 31. Third Suffolk 43,795; 32. Fourth Suffolk 49,678; 33. Fifth Suffolk 51,263. 34. Sixth Suffolk 51,988; 35. Seventh Suffolk 45,862; 36. First Worcester 43,885; 37. Second Worcester 42,803; 38. Third Worcester 46,521; 39. Fourth Worcester 40,633; 40. Worcester and Hampden 40,859.

Attorney General are as favorable to his contention as any division that can be devised. The variations from equality of numbers of legal voters differ only slightly in the three plans. According to the division most favorable to the contention of the Attorney General the variations from the standard number of legal voters in a district comparable to such variations in the statutory division are as follows: average variation from this standard in the forty districts, 1,494 legal voters, or 3.23% of the standard; average variation from the standard in all districts — eight in number — including any part of the county of Suffolk, 3,477 legal voters, or 7.53% of the standard; average variation from the standard in the thirty-two remaining districts, 998 legal voters, or 2.16% of the standard. The greatest variation from the standard in an oversize district is in the Norfolk and Suffolk District, which exceeds the standard by 6,206 legal voters, or 13.41% of the standard; and the greatest variation from the standard in an undersize district is in the First Suffolk District which falls below the standard by 7,903 legal voters, or 17.11%. Though, as above set forth, the average variation — however computed — from the standard number of legal voters is somewhat greater in the statutory division than in the divisions proposed by the Attorney General, the disparity in number of legal voters between the district having the largest number of such voters and that having the smallest number is slightly greater in the divisions proposed by the Attorney General than in the statutory division. Furthermore, in two of the suggested plans for division there are five combination county districts of which one includes the whole or a part of four different counties; two include parts of three different counties and two include parts of two different counties. In the third suggested plan there are six county combination districts, of which one includes the whole or a part of four different counties; one includes parts of three different counties, and four include parts of two different counties. The county combination districts in each of these plans are, therefore, fewer in number than in the statutory division.

There have been no decisions of this court with respect to

statutory divisions into senatorial districts. The decisions have related to the division of counties into representative districts and the apportionment of representatives among them. In one of those cases, *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, the court refused to declare invalid a division of a county into representative districts and the apportionment of representatives thereto, though there were numerous substantial variations in the number of legal voters from the standard number for each representative. In seventeen of the twenty-seven representative districts the variations from the standard exceeded 9.20% of the standard, running as high in four districts respectively as 24.24%, 25.50%, 26.64% and 31.43%. And in *McGlue* v. *County Commissioners*, 225 Mass. 59, 64, a variation of slightly over 5% in the number of legal voters to whom a representative was allotted from the standard representative unit was described as "comparatively insignificant." On the other hand, in *Donovan* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 55, an apportionment was declared invalid where three representatives were allotted to a district having fewer legal voters than a district to which two representatives were allotted, and two representatives were allotted to a district having fewer legal voters than a district to which only one representative was allotted. In one instance a variation from the standard number of legal voters exceeded 71% of such standard, in another instance a variation exceeded 32% of such standard, and in other instances variations from the standard were large. In *Attorney General* v. *Suffolk County Apportionment Commissioners*, 224 Mass. 598, an apportionment was declared invalid where, in one instance, the variation from the standard exceeded 89% of such standard, and there were numerous other large variations from the standard, including one of 64% and one of 77% therefrom. And in *Merrill* v. *County Commissioners*, 257 Mass. 184, 188, an apportionment was declared invalid where it appeared that the variation from the standard in one instance exceeded 42% of such standard, and there were numerous other

large variations from the standard; and it was found as a fact that it was possible "to divide and apportion Essex County so that the numerical excess and shortage of the several districts complained of . . . would be materially lessened."

Of course no precise rule can be laid down as to the extent of permissible variations from the standard number of legal voters measured in percentages of such standard. The extent of such permissible variations depends upon particular facts, especially the size of the indivisible units that are to be combined into districts of contiguous territory. It may well be that larger variations from the standard, measured in percentages of such standard, are permissible in representative districts than are permissible in senatorial districts — by reason, in the case of representative districts, of the smaller standard and the impossibility of uniting counties or parts of counties, though the difficulty of attaining equality resulting from these limitations is in some degree offset by the possibility of allotting one, two or three representatives to a single representative district. See *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, 128. Yet the decisions in the cases above referred to dealing with representative districts show, at least, that under the constitutional provision relating **to** senatorial districts — which is similar in language to that relating to representative districts governing these cases — somewhat substantial variations from the standard number of legal voters in a senatorial district are not necessarily fatal to a statutory division of the Commonwealth into senatorial districts. And the conclusion follows, though more remotely, that a statutory division is not necessarily invalid because it unites parts of different counties in one district to an extent not unreasonable though not absolutely unavoidable. Moreover, the average variation from the standard number of legal voters in the statutory division is much smaller than many of the variations from the standard in *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, where the apportionment of representatives was upheld. And even the extreme

variations in the statutory division measured in percentages are considerably less than the extreme variations from the standard in that case.

In the light of the decided cases, therefore, the general analysis of the statutory division fails to demonstrate that the General Court, in the exercise of its judgment and discretion in dividing the Commonwealth into senatorial districts, acted unreasonably in uniting counties or parts of counties in one district or departed to an unreasonable extent from equality of numbers of legal voters among the districts. The cases from other jurisdictions that have been brought to our attention are in accord with the general principles above stated, but furnish little assistance in the application of those principles. They are not in conflict with the conclusion here reached. Consequently, if the statutory division is to be declared invalid it must be so declared by reason of particular instances in which the requirements of the Constitution are not observed.

B.   We proceed, therefore, to consider the specific districts with reference to the variations therein from the standard number of legal voters and to the combinations in districts of the whole or parts of different counties. Such particular instances, however, must be considered as parts of a unitary plan for division of the Commonwealth into senatorial districts, with recognition of the fact that correction of an apparent fault in one district may require a substantial change of one or more other districts, or even rearrangement of a substantial part of the entire plan of division.

(1) Berkshire, Franklin, Hampshire, and Hampden counties. Clearly some county combination districts are required in this area, since the number of legal voters in the county of Berkshire considerably exceeds the standard for one senatorial district, but falls considerably below twice the standard, and the number of legal voters in each of the counties of Franklin and Hampshire falls considerably below that standard. Furthermore, the aggregate number of legal voters in these three counties is considerably less than three times the standard so that combination with part

of the county of Hampden, part of the county of Worcester, or parts of both counties, is required. The statutory division providing for one district wholly in the county of Berkshire, two districts wholly in the county of Hampden, a district composed of parts of each of the counties of Berkshire, Hampshire and Hampden, a district composed of the whole of the county of Franklin, part of the county of Hampshire and one town (Ludlow) in the county of Hampden, and a district composed of part of the county of Hampden and part of the county of Worcester cannot rightly be said to be unreasonable. Criticism is made of the inclusion of the Hampden County town of Ludlow in the Franklin and Hampshire District. The location of this town, however, is such that, apart from the existence of the county line, it might naturally be included in this district. Moreover, inclusion therein does not increase the number of county combination districts, but treats the town in a manner somewhat similar to the treatment accorded to other towns in the county of Hampden, which are combined with parts of the county of Hampshire and of the county of Berkshire, and brings the Hampshire and Franklin District somewhat nearer to the standard number of legal voters. And the natural alternative to this treatment of the town would be to include it in another county combination district — the Worcester and Hampden District. (This district is considered later in connection with the Worcester County districts.) In three of the other five districts referred to there is close approximation to the standard number of legal voters, and in two of them that standard is exceeded respectively by 7.40% and 7.69% of such standard. In view of the locations of the several units — towns and wards — with relation to each other these variations do not appear to be unreasonable.

(2) Worcester County. This area presents no question with relation to county combination districts — apart from the combination of the Worcester County town of Blackstone with parts of Middlesex and Norfolk counties — unless, indeed, a further combination of units in one or more other counties with Worcester County units should

have been made by reason of the number of legal voters in the county of Worcester. This county has a sufficient number of legal voters to form four standard districts with an excess of nearly half enough voters to form another district of the standard number of such voters. The statutory division, as is natural, combines a part of the county of Hampden with a part of the county of Worcester to form a fifth district — the Worcester and Hampden District. This district falls short of the standard by 11.52% of such standard and three wholly Worcester County districts are deficient in number of legal voters respectively by 4.97%, 7.32% and 12.01% of the standard. Two of these four variations are extreme and perhaps could have been corrected to some extent by rearrangement of units within the county of Worcester, but a substantial correction would have required considerable modification of the statutory division, including combination of more units from another county or counties with units from the county of Worcester. We cannot quite say that the failure to make such modification and combination is so unreasonable as to vitiate the statutory division. The inclusion of the town of Blackstone in the Worcester County District nearest it would have somewhat reduced the variation of that district from the standard number of legal voters, and the failure to do so is not easy to justify, though the inclusion of that town in a county combination district — the Middlesex and Norfolk District — brings that district nearer to the standard and does not increase the number of county combination districts.

(3) Bristol County. This area presents no serious problem of variation from standard number of legal voters in a senatorial district, and no problem of county combination districts except by reason of the inclusion in one of the districts of the Norfolk County town of Plainville with 769 legal voters. This would be a natural inclusion, so far as location is concerned, apart from the existence of the county line, but does nothing toward securing closer approximation to equality of numbers of voters among the districts.

(4) **Essex County.** This area presents no serious problem as to variation from standard number of legal voters, though some variations are greater than any in the Bristol County area. But the greater variations seem to have some justification. This area presents no problem of county combination districts except in the instance of the inclusion of the Middlesex County town of North Reading in the Fourth Essex District creating an additional county combination district. This inclusion, by reason of the location of the town, would be natural, apart from the existence of the county line, and materially reduces the variation from standard of the Essex County District in which the town is included, though at the expense of increasing the variation from standard of the nearest Middlesex County District and the average variation from standard of the two districts affected.

(5) **Middlesex, Suffolk and Norfolk counties.** A principal ground of attack upon the statutory division is the treatment of the county of Middlesex, particularly with reference to the fact that wards of the city of Cambridge are included in five different senatorial districts. The larger part of this city, however, is included in one such district. Doubtless the General Court in the exercise of its judgment and discretion may give weight to the desirability of treating a city as an entity, but it is not required to do so by the Constitution, which makes the ward, and not the city, the indivisible unit.

The county of Middlesex has almost exactly enough legal voters to form nine senatorial districts. The statutory division creates seven wholly Middlesex districts and distributes the remainder of the county among five county combination districts. Three of the wholly Middlesex districts are substantially oversize, being respectively 11.86%, 11.97% and 12.38% of the standard number of legal voters above such standard, and one is substantially undersize, being 8.70% below that standard. Some reason for such variation is to be found in the very large number of legal voters in several towns constituting indivisible units, as well as in the rather large number of legal voters in some wards of cities. The Attorney General's proposed plans show

that these grounds did not absolutely require such extreme variations. Avoidance thereof, however, would necessitate considerable rearrangement of towns and wards of cities.

The five county combination districts in which parts of the county of Middlesex are included are the Fourth Essex District, already mentioned, the districts in which combinations are made with parts of the county of Suffolk — the Middlesex and Suffolk District, the Second Suffolk District and the Third Suffolk District — and a district in which combination is made with parts of the county of Norfolk and of the county of Worcester — the Middlesex and Norfolk District.

The combinations of parts of the county of Middlesex with parts of the county of Suffolk require consideration of the division of the latter county. It is conceded that the First Suffolk District, consisting of the town of Winthrop and the cities of Chelsea and Revere, though falling 17.11% below the standard number of legal voters, is properly constituted. The numbers of legal voters in the several wards of the city of Boston constituting the remainder of the county — ranging from 10,787 to 19,254 — render particularly difficult the formation of districts approximating the standard of legal voters. No suggestion is made of correction of the Seventh Suffolk District, which is .69% below the standard, nor of the Fourth Suffolk and Sixth Suffolk districts, though they are respectively 7.56% and 12.56% in excess of the standard. There remain for combination into districts twelve wards having an aggregate number of legal voters nearly three and three fourths times the standard number of legal voters for a district, so that combination with a part of some other county would be required to create a fourth district. Such combination either with part of the county of Middlesex or with the town of Brookline in the county of Norfolk would be permissible, and that town, wholly separated from other parts of the county of Norfolk, could be combined either with part of the county of Suffolk or with part of the county of Middlesex. By the statutory division, combinations are made with the town of Brookline in one district — the Norfolk and Suffolk District — and with

parts of the county of Middlesex in three different districts — the Middlesex and Suffolk District, the Second Suffolk District and the Third Suffolk District — so that four county combination districts result. The Middlesex and Suffolk District is predominantly a Middlesex County district, including one ward of the city of Cambridge, the entire city of Newton, and a large ward of the city of Boston. The Second Suffolk and Third Suffolk districts are predominantly Suffolk districts, each including three large wards of the city of Boston and one comparatively small ward of the city of Cambridge. The combination in each instance, so far as location of the units is concerned, is natural except for the existence of the county line. Two of the districts including parts of the county of Middlesex are considerably oversize, and the district including the town of Brookline is undersize.

The alternative division proposed by the Attorney General would substitute for the four combination districts in which parts of the county of Suffolk are included three districts wholly within that county, no one of them varying greatly from the standard number of legal voters, and a county combination district — the Norfolk and Suffolk District — having a number of legal voters 13.41% in excess of the standard number — a somewhat larger excess than in any district formed by the statutory division — and would leave the parts of the county of Middlesex placed by the statutory division in county combination districts for rearrangement in Middlesex County districts. While the alternative division possesses obvious advantages it has, at least, one obvious disadvantage; and, in our opinion, the choice of the statutory division as against the proposed or any other alternative division was not so clearly unreasonable as to fall outside the scope of exercise by the General Court of its judgment and discretion.

The fifth county combination district in which parts of the county of Middlesex are included is the Middlesex and Norfolk District. In this district the county of Middlesex is predominant, having nearly three fourths of the legal voters of the district. It is somewhat, but not seriously, deficient in number of legal voters. The occasion for such

a county combination district will be considered in connection with the area comprising Norfolk, Plymouth, Barnstable, Dukes and Nantucket counties.

(6) Norfolk, Plymouth, Barnstable, Dukes and Nantucket counties.  The counties of Barnstable, Dukes and Nantucket together lack a sufficient number of legal voters to constitute a senatorial district.  Consequently a county combination district including part of the adjoining county of Plymouth was required.  The statutory division forms such a district — the Cape and Plymouth District.  This district is slightly, but not seriously, undersize, being 6.37% below the standard number of legal voters.  There remain in the county of Plymouth too many legal voters for one district, but not enough for two districts, so that combination with a part of some other county was required.  The statutory division forms (apart from the Norfolk and Suffolk District already considered) one wholly Plymouth district, a county combination district including part of the county of Norfolk and part of the county of Plymouth, and two wholly Norfolk districts, with part of the county of Norfolk remaining to be combined with part of the county of Middlesex.  Each of these four districts is somewhat deficient in number of legal voters — the Plymouth District having the greatest deficiency, 12.32% of the standard, of any district other than the First Suffolk District.  Apparently a rearrangement of these four districts could have been made that would have brought each of them nearer to the standard number of legal voters and rendered unnecessary a combination of any part of the county of Norfolk with a part of the county of Middlesex, so that another wholly Middlesex district could have been formed.  The part of the Middlesex and Norfolk District left to be included in such a wholly Middlesex County district, however, would be insufficient to form a district, and combination with other Middlesex units would be required.  The method by which this could be done without a considerable rearrangement of the districts in the county of Middlesex is not obvious since the nearest of these districts is itself deficient in numbers. (The division proposed by the Attorney General involves

such a considerable rearrangement.) The treatment of this area by the statute, though fairly open to criticism, is not so clearly unreasonable as to invalidate the statutory division.

C. From a general analysis of the statutory division and an examination of specific districts created thereby we conclude — somewhat paraphrasing the opinion in *Brophy* v. *Suffolk County Apportionment Commissioners*, 225 Mass. 124, 128 — that the statutory division is not "ideal," and that doubtless a closer approximation to equality in number of legal voters among the districts and avoidance of county combination districts could have been made. No very convincing grounds appear for including in a senatorial district a single town in one county with parts of another county, or of other counties, as is done in several instances. And apparently it would have been possible to avoid the formation of some of the other county combination districts without creating unnecessary variations from the standard number of legal voters in any district. But in general such avoidance would have required substantial rearrangements of districts. Apparently, also, by such rearrangements many of the larger variations from the standard number of legal voters in a district could have been avoided. Nevertheless, recognizing, as we must, that the duty of dividing the Commonwealth into senatorial districts is imposed by the Constitution upon the General Court, to be exercised in accordance with its judgment and discretion, and that every reasonable presumption of validity attaches to a statutory division made in performance of this duty, we cannot rightly say that the division made by St. 1939, c. 507, is so unreasonable in its application to any specific district or districts, considered as a part of the unitary plan of division of the Commonwealth, that this statutory division transcends the constitutional power of the General Court and should be declared void.

Fifth. The respondent has argued that the information should be dismissed on the ground of laches of the Attorney General because of his failure to file his information with due diligence — since the act was approved by the Governor

on August 12, 1939, and the information was filed on February 28, 1940 — resulting in interference, by reason of the pendency of the proceeding, with the orderly conduct of elections affected by the statute. In view of the conclusion reached on another ground this defence need not be considered.

Sixth. The respondent filed a motion to strike from the information certain allegations in considerable detail to the effect that in making the statutory division the General Court was actuated by partisan motives. The report of the single justice is to be interpreted as reporting the question of law whether this motion should be allowed. A motion to strike was correct practice. See *Lane* v. *J. W. Lavery & Son, Inc.* 294 Mass. 288, 295, and cases cited. And the motion was well founded. Not only could no evidence be received of facts tending to show that the General Court was actuated by such motives (*Donovan* v. *Suffolk County Apportionment Commissioners,* 225 Mass. 55, 58), but the question whether the General Court was so actuated is not a proper subject for judicial inquiry. *Merrill* v. *County Commissioners,* 257 Mass. 184, 187. See also *Arizona* v. *California,* 283 U. S. 423, 455; *People* v. *Thompson,* 155 Ill. 451, 469; *People* v. *Carlock,* 198 Ill. 150, 157; *Sherrill* v. *O'Brien,* 188 N. Y. 185. The motion, therefore, is to be allowed.

It follows from what has been said that an order is to be entered allowing the respondent's motion to strike, and that the information is to be dismissed.

*So ordered.*